LOTTINGER, Judge.
This is an appeal from a judgment rendered in connection with a Workmen’s Compensation suit arising as a result of an injury sustained by the plaintiff on July 13, 1961.
At that time, the plaintiff, Eli Allen was employed by Austin Bridge Company, with a salary of sufficient magnitude so as to qualify the plaintiff for Workmen’s Compensation benefits of $35.00 per week. On July 13, 1961, while putting a jack under a truck, the jack slipped and knocked the plaintiff to the ground, injuring his right leg and knee. Allen was first examined by the company physician, Dr. Webb, who referred him to a Dr. Altenberg, an orthopedic surgeon, who diagnosed the plaintiff’s condition as a torn medial meniscus. Dr. Altenberg performed a menisectomy on the right knee on July 31, 1961. Allen was subsequently given treatment of whirlpool baths and quadraceps exercises. Shortly thereafter he returned to light duty with his employer and then actually resumed full duty on January 8, 1962. He was paid compensation at the rate of $35.00 per week from the date of his injury up to and including January 8, 1962, when he returned to work. He continued to work for his employer, Austin Bridge Company, until July 27, 1963, when he left their employment, and did not resume work with that firm *821 until September, 1963, when he worked for approximately two weeks and was discharged. The plaintiff further claimed that on or about May 15, 1962, while picking up some forms about four feet long and two feet wide, he sustained an injury to his ;back.
The instant suit was filed on May 7, 1963, naming as defendants plaintiff’s employer, Austin Bridge Company, and their ■compensation insurer, Superior Insurance Company of Dallas, Texas.
After a trial on the merits, the District Judge rendered judgment awarding the •plaintiff the sum of $35.00 per week for ■400 weeks, subject to a credit for all payments previously made to him, and in connection therewith furnished written reasons for judgment wherein he recited in substance the percentage of partial permanent •disability assigned to plaintiff’s knee by the various medical witnesses was functional in nature and therefore in fact permanently •disabled the plaintiff.
Defendants have appealed to this Court, specifying as error only that the Trial Judge • erred in concluding that the plaintiff sustained a functional disability that entitled 'him to compensation for total and permanent disability. It is conceded by counsel for defendants that the plaintiff did in fact •suffer the injury complained of on the date .alleged; and that this injury occurred within the course and scope of the plaintiff’s •employment. It is the position of the defendant that the permanent residual disability which exists in the plaintiff’s knee is non-functional in nature, therefore does not interfere with or hinder the plaintiff in the performance of the same work which he was doing at the time of the accident .and therefore is not compensable.
We believe that it is necessary in this instance to briefly review the testimony of each of the witnesses, both lay and medical, with particular reference to whether or not •.the injury sustained by plaintiff is in fact functional
Dr. Chestnutt initially saw the plaintiff on May 22, 1962. At that time he found that the plaintiff had an old operated injury to the right knee with some instability of the knee due to muscular weakness. He attributed the muscular weakness to disuse while the plaintiff was in a cast and a concurrent delayed return of strength to that muscle. Allen’s reflexes were normal and the function of his knee appeared to be normal, except that with motion he had some pain, and there was a slight amount of swelling which Dr. Chestnutt testified as always present after an operation on the knee. He saw Allen again on May 30, at which time he found the muscular tension which had previously existed still present, but not to as great a degree as it had been previously. We might mention here that during the time that Dr. Chestnutt was treating Allen, Allen had already returned to light work. Dr. Chestnutt subsequently saw the plaintiff on June 8, June 15, June 22, June 29, July 5, July 13, July 27, August 11, August 18, September 16, and October 1, 1962. During these visits there was a general improvement in the plaintiff’s condition and on the July 27 visit he found that Allen was sufficiently improved so that he recommended that he return to full duty on a trial basis for three weeks of every month and return to his office for evaluation on the fourth week of each month. He testified that the plaintiff returned to full duty on September 16, 1962, and testified that in his opinion on October 1, 1962, the plaintiff’s knee had sufficiently recovered in order for him to carry out full duty. At that time, Dr. Chestnutt testified that he advised the plaintiff that if he was unable to carry out full duty, to notify his employer and for him also to consult Dr. Chestnutt in two months whether or not he was able to carry out full duty. He also said that since Allen never returned, he assumed that he was continuing to do full duty. He likewise testified that on the basis of his last examination, it was his considered medical opinion that Allen could return to full duty. When asked whether or not in his opinion the permanent disability *822 in the right knee would impair Allen’s ability to perform his former job to the extent that his earning capacity would be impaired or reduced, the doctor replied: “No, sir, in my opinion that wouldn’t impair his ability to work . . .”. He also testified:
“Q. At that time, tell us whether or not you felt that any residual permanent disability that he might have would be functional?
A. By functional you mean disabling.
Q. Yes.
A. No, sir.
Q. And nothing has occurred to change your opinion?
A. Nothing has occurred to change my opinion.”
Dr. William Moody, a general practitioner, testified on behalf of plaintiff and stated that he saw plaintiff on June 25, 1963, at which time he found a wasting of the right thigh and reviewed some X-rays taken by another physician. He said that the X-rays revealed that the right leg was about one-half inch short, and at that time estimated that the plaintiff had a ten per cent disability of the right knee. Dr. Moody saw the plaintiff again on July 2, 1963, and on September 26, 1963. On the date of the last visit, he found that the right knee had improved, that the upper part of the leg above the knee was beginning to fill out; that is, the muscles were beginning to return, the lower portion of the leg was still atrophied or shrunken. On cross-examination, Dr. Moody admitted that he had never measured Allen’s knee, and when asked if at the time of his examination on June 25, 1963, whether or not the plaintiff’s knee was swollen, he replied: “I think it was”. He had no record of swelling on his office records. The doctor testified that he was of the opinion that the plaintiff had a ten per cent disability of the right knee. Dr. Moody was of the opinion that the injury sustained by the plaintiff was in fact functional.
Dr. Ira George next testified in behalf of plaintiff and was qualified by the Court as an expert orthopedic surgeon who testified that he examined the plaintiff initially on October 2, 1962, at which time he was-complaining of pain in his back and the doctor noticed some tenderness in the lumbo-sacral region as well as noting the scar from the removal of the knee medial meniscus. He found that the ankle and knee joints-were active and equal and that there was no-muscle spasm. Dr. George’s estimate of the disability of the plaintiff was twenty-four per cent of the entire body and he was of the opinion, at the time of the trial, that the plaintiff was incapable of doing heavy manual labor. Dr. George next saw the plaintiff on June 25, 1963, at which time-he found the measurement of both knees to-be substantially the same, and pain over the lumbosacral joint He next saw the plaintiff on September 26, 1963, at which time the patient complained of pain in his lower back which was referred down his left leg to his knee. He found the right knee tender to pressure and tenderness over the lumbosacral joint. He testified that if Allen did heavy work it would cause his back to hurt. Dr. George, upon redirect examination, did furnish a disability figure of twenty per cent for the right knee.
Dr. Thomas Campanella testified on behalf of plaintiff and was qualified as an expert orthopedist. He testified that he examined the plaintiff on September 30, 1963 and at that time the plaintiff moved easily during the examination, that the examination of the back was entirely negative, other than some subjective complaints of soreness in the small part of the back. He found that the knee joint was not tender and was freely movable with a good range of motion, there being no evidence of any fluid within the joint, nor any evidence of any instability of the joint. The circumference of the right knee directly over the middle of the patella on the right knee measured 14 and % inches, whereas on the left it measured 15 inches. The calf of the leg six inches below the middle of the *823 patella was exactly the same as that of the knee for both legs. The doctor testified that these measurements indicated that the plaintiff still had a mild atrophy of the muscles of the leg. His diagnosis, based on the examination, was a medial menisectomy of the right knee, healed, and an acute lumbosacral strain, healed. Dr. Campanella .assigned a permanent ten per cent disability of the right knee as a result of the removal of the medial meniscus. He also stated that Allen had the same mobility and ability to get around and use his right knee as he had before the operation. He then testified as follows:
“Q. Now, Doctor, we like to use a phrase, which I refer to as functional. I would like to ask you this question. If, from your examination of Eli Allen, the minor permanent residual disability of his knee, or him in his entirety, was in any way functional or impaired his ability to perform his former employment to the extent that his earning capacity would be impaired or reduced ?
A. No.
Q. In other words, your conclusion is that he can go back to work and do anything that he ever did before ?
A. That’s correct.
Q. Counsel went into, at length, the possibility of some future situation. Isn’t it entirely true, Doctor, that that would be completely speculative and conjectural as to what extent, if any, there would be a progression of symptoms or what disability might occur in the future ?
A. That’s correct.
Q. You have absolutely no way of foretelling and to fix any — to make any definite statement that he will get any worse. You just can’t do it?
A. That’s right, sir.”
He then stated:
“Q. And I believe we can wind it up by saying that there is no medical reason, clinical, Roentgen, or otherwise, for this man to have any pain or be in any way disabled from performing his work for Austin Bridge Company. Is that not correct?
A. That’s correct.”
Dr. William Smith testifed on behalf of defendants and was qualified as an expert orthopedic surgeon. He first saw the plaintiff on August 21, 1961, at which time he testified he found a well healed scar at the knee and a minimum amount of fluid within the knee joint. He found some limitation of motion in the right knee joint at that time with the plaintiff being unable to completely extend the knee. He prescribed whirlpool baths and exercises and at that time estimated that the plaintiff would have a temporary disability period of twelve to sixteen weeks and also felt that he would probably have a good functional knee. He next saw the plaintiff on September 25, 1961, and found that he had responded well to the therapy and still had a slight atrophy on the right side, however was found to have a full range of painless motion in the right knee. At that time the doctor felt that the plaintiff was capable of returning to his former occupational duties. He next saw him on October 6, 1961, at which time the findings were essentially the same as they had been on the last visit. On October 30, 1961, the plaintiff complained to the doctor of some pain in or about the right knee since returning to work. Dr. Smith examined the plaintiff and found the same full range of painless motion in the knee and some complaint of tenderness to palpation beneath the medial edge of the right patella. He attributed these symptoms to a softening of the surface of the kneecap which he testified was an expected result of a removal of the medial meniscus. He next saw him on November 10, 1961, at which time the plaintiff informed him that *824 he was unable to return to work due to continued pain in and about the right knee. The examination revealed a continued one-half inch atrophy of the right thigh as compared to the left, no swelling in the right knee joint, no apparent tenderness to palpation, and a slight limitation to full flexion of the right knee as compared to the left. As a result of this examination, the doctor concluded that the plaintiff continued to display some continued disability in the right knee in the form of this atrophy and a slight limitation of motion. He was still of the opinion that at that time the plaintiff was able to continue his regular duties as a laborer. He next saw Allen on August 28, 1962, at the request of Dr. Charles Chestnutt at which time the plaintiff complained of intermittent pain in the right knee and occasional swelling. On this occasion physical examination revealed no limp and no external supports and the fact that the muscular development around the knee had greatly improved. Dr. Smith stated that this muscular development around the knee indicated to him that Allen had had even better results than are usually expected following surgery. At that time, he felt that Allen had made a very good recovery from the injury to his right knee and this was partially indicated by the fact that the atrophy which existed in the muscles above the knee immediately after the injury had eliminated itself by use, which Dr. Smith said is indicative of the fact that the patient had been using his leg. He made comparative measurements at that time of both legs and thighs, kneecaps and calves, and found that generally the right extremity was larger than the left. He found the right knee had a full range of motion with no evidence of lateral instability. The disability assigned by him to the plaintiff’s knee was five per cent and this was done on the basis of the removal of the medial meniscus. Dr. Smith stated that he felt the plaintiff was capable of returning to his former occupational duties as a laborer. He next saw the plaintiff on September 24, 1963, shortly before the trial, and after the plaintiff had worked for the defendant for several days. He found the right knee to be completely within normal limits, there being a full range of motion, no clinical evidence of thickening or swelling in the joint, or lateral instability. The same percentage of disability as had been previously expressed was expressed again by the doctor with the statement that he felt certain that Allen was capable of continuing his occupational duties as a, laborer. We might mention here that this-last examination by Dr. Smith was made at about 4 or S o’clock in the afternoon after the plaintiff had worked an entire day. Dr. Smith further testified that the 5% disability assigned by him was in no way functional nor did it impair the plaintiff’s ability to perform his former employment to the extent that his earning capacity would be impaired or reduced, and further testified that the plaintiff should be capable of continuing to work as a laborer and should experience no appreciable difficulty in doing so.
Dr. William L. Meuleman is a qualified orthopedist whose testimony was taken by deposition. He had examined the plaintiff on August 5, 1962, at which time the plaintiff demonstrated a limp on the right side, atrophy of the thigh muscle and swelling within the knee joint. He stated that he felt that the plaintiff had returned to work too soon after his injury and recommended to him that he stay away from hard manual work for a time. He summed up his statement by saying that the plaintiff demonstrated what was a chronic strain brought on by having gone back to full duty too soon after the surgical procedure. On July 11, 1963, Dr. Meuleman again examined the plaintiff and found that he had no swelling of the knee joint and was able to flex and extend it completely. The knee joint was stable and the plaintiff walked without evidence of a limp. His disability of the knee was rated by Dr. Meuleman at 12%. In discussing whether or not the disability *825 was functional, the doctor testified as follows :
“Here taking in the last examination, showing atrophy hut nonetheless good strength, complete motion and good stability, I do not feel that it should materially interfere with anything that such construction work would entail. I think the man can function with the operation that he had.”
The final medical witness, whose testimony was likewise taken by deposition, was Dr. Altenberg, who was qualified as an •orthopedic specialist. He treated the plaintiff initially on July 24, 1961, Allen having been referred to him by Dr. George Webb in Tallulah, Louisiana. When he first examined him, he found a mild thickening and swelling of the knee, pain and tenderness over the medial meniscus, no instability of the knee joint, and fluid in the knee joint. His diagnosis was that of a torn and locked medial meniscus. He recommended surgery to Dr. Webb, and with the concurrence of Dr. Webb and the plaintiff, the removal of the medial meniscus was accomplished on July 31, 1961. He testified that the only demonstrable pathology in the knee at the time of the removal was the meniscus which was badly fragmented and obviously re■cently torn. He treated the patient subsequent to the operation and saw him last -in his office on August 11, 1961, at which time he found that the plaintiff’s knee had -progressed to a remarkable degree. His range of motion was good, his strength in the joint was good, and he was advised when he returned to Baton Rouge to consult with an orthopedist and to continue his treatment and physical therapy. The doctor did testify that he saw the plaintiff again in his office on July 9, 1963, at which time the knee joint showed no evidence of swelling or effusion. He assessed the plaintiff’s disability at 5% permanent partial •disability of the knee and testified that at the time he examined the plaintiff on July 9, 1963, it was his opinion that the plaintiff was capable of doing all types of heavy labor and that he had completely recovered from the injury.
Mr. Earl D. Simpson was called under cross examination in his capacity as an employee of Austin Bridge Company and testified that he was a foreman for that company and recalled the time that the plaintiff had been hurt initially. He testified about the period of time when Allen was off of work due to his injury and about the fact that he had returned to work and the fact that he returned to do the same work that he had been doing at the time that he was injured. He recalled having brought Allen to see Dr. Meuleman in Lafayette in 1962, because he was complaining about his leg bothering him. He testified that subsequent to Allen’s return to work, he had not in any manner complained to him about his knee swelling or hurting him, with the exception of the time that he brought him to Dr. Meuleman in Lafayette. On direct examination he testified that Allen had returned to work for Austin Bridge Company very shortly before the trial and that he had worked under his supervision in September of 1963. He stated that during the period that he worked for the company, shortly before the trial he never gave any indication whatsoever of having any difficulty with his knee, his back, or anything else and stated that he performed his work as usual, made no complaints of pain and no complaints of inability to work. He stated that his walking was natural and he did all the phases of his job in every way that he was instructed and further stated that Allen was doing the same thing that he was doing before he ever went to a doctor and he did it just as well as he had ever done it.
Douglas Sterling testified on behalf of plaintiff and stated that he had worked with the plaintiff in May of 1962 for the defendant company and that he had noticed during that time that the plaintiff’s knee was worrying him because the plaintiff had told him that his knee was swollen. He testified that the plaintiff had at that time, on two occasions shown him his knee and that *826 lie observed that the right knee was bigger than the left
Mr. Valta Sterling testified on behalf of plaintiff and stated that he was an employee of Austin Bridge Company and had been a co-worker of Allen’s at the time that he injured his knee. He stated that when Allen had returned to work after the injury, it was in the capacity of his helper. He likewise testified as to Allen’s having shown him that his knee was swollen in 1962. He stated that he was still employed by Austin Bridge Company when the plaintiff returned to work shortly before the trial and that the plaintiff worked with him in various places finishing concrete as well as removing some forms. He stated that during this period, the plaintiff complained that his back and his knee hurt him.
Eugene Adams testified that he was likewise employed by Austin Bridge Company in 1962 and that he had noticed swelling in the plaintiff’s knee at that time on occasion. He was not employed by Austin Bridge Company when the plaintiff went back to work shortly before the trial.
Mr. Wilbert Webb testified that he had been employed by Austin Bridge Company for about two years prior to the trial and he recalled in 1962 he had observed that the plaintiff’s knee looked swollen; however, he did admit that the plaintiff had shown the knee to him only one time. With reference to Allen’s work with the company in the period immediately before the trial, he testified that he and Allen were doing the same work and that Allen on one occasion in the first week of his employment had mentioned something about his back and that he had noticed a limp in his walk.
Junior Broussard testified on behalf of defendant and stated that he was an employee of Austin Bridge Company and had worked with the plaintiff in his period of employment shortly before the trial. He said that he had seen him work and had not noticed anything with reference to his work that was different from that of any of the other cement finishers. He also said that at no time had the plaintiff complained about pain in his back or his knee.
Opheulus Duhon testified on behalf of defendant and his testimony was substantially that of Mr. Broussard’s
Mr. Reeves Stephenson, an employee of Austin Bridge Company, testified that on September 24, 1963, he had been instructed! to take the plaintiff to Dr. Smith’s office. He said that he had gone to get the plaintiff and asked if his knee was bothering him, and that the plaintiff had replied a little bit, but not very much. He then asked the plaintiff to raise his trouser leg, and the plaintiff raised both of them, and Stephenson testified that he noted no swelling in either of his knees. He thereafter took him to the doctor’s office and noticed all through this time that the plaintiff walked with no limp whatsoever.
Mr. A. R. Singleton, a manager of the Austin Bridge Company, testified on behalf of defendant and stated that Eli Allen had made no complaints to him of pain or difficulty while he was working directly at the yard under his supervision for several days immediately prior to the trial. In addition, he stated that he had not noticed any abnormal use of his leg by the plaintiff.
Counsel for appellants cites to us the case of Lee v. Royal Indemnity Company, La.App., 149 So.2d 606, a case decided by us in 1963. At that time, when confronted with an objection to the offering of lay testimony in a case, where there was no conflict as to the medical testimony, we stated that in the absence of a material conflict in the medical testimony, lay evidence may not be considered in determining disability in a suit for Workmen’s Compensation benefits. We also said that the lay testimony was admissible until such time as all of the medical evidence had been offered, since it could not be determined whether or not there was a conflict in the *827 medical testimony until all of it was in. In this case, we obviously have lay testimony •on both sides. Counsel for appellant urges that there is no material conflict in the medical testimony and therefore, under the Lee case, the lay testimony should not even be considered.
In view of the fact that at least one general practitioner and one qualified orthopedist have testified that in their opinion the disability suffered by the plaintiff is functional in nature, as opposed to the testimony of another general practitioner and several orthopedists’ testimony that in their opinion the plaintiff’s disability is not functional, we will not make the absolute determination in this instance that there is no conflict in the medical testimony. In substance, we believe the question to be moot in this instance, as we believe that the lay testimony adduced is to the same net effect as the medical testimony. We will therefore assume, argu-endo, that the conflict in the medical testimony does exist and we have therefore taken into consideration all of the testimony adduced at the trial and by deposition, both medical and lay.
Our examination of the record leads us to the conclusion that the Trial Judge committed manifest error in according more weight to the testimony of one .•general practitioner and one orthopedist who were of the opinion that the plaintiff’s injury was functional in nature than he did to the testimony of one general practitioner and several well qualified orthopedists, to the effect that the plaintiff’s injury was non-functional in nature. We might observe here that one of the latter orthopedists, Dr. Campanella, was the plaintiff’s ■own witness and the plaintiff is, of course, bound by his testimony.
It is not our intention to disrupt or, •change the established principle that mere numbers of witnesses are not sufficient to create a preponderance but we are of the opinion that the quality, accuracy, and sincerity of each of these medical witnesses, all of whom were subjected to rigorous cross examination, is at least equal to that of each of the other medical witnesses. We are likewise satisfied that equal weight should be given to substantially all of the lay testimony.
The Trial Judge obviously accorded great weight to the testimony of Drs. Moody and George; sufficient weight, in fact, so as to completely negate the testimony of Drs. Chestnutt, Campanella, Smith, Meuleman and Altenberg.
Our reading of the record clearly illustrates to us that the preponderance of the evidence, both medical and lay, is to the effect that the injury sustained by the plaintiff was not of such a character as to prevent him from doing the same work that he was doing prior to the accident.
Accordingly, the judgment of the Trial Court is reversed, and the plaintiff’s suit is hereby dismissed at his cost.
Judgment reversed.